**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

FORTUNADO ORTIZ,

                          **Plaintiff,**

              **-against-**

COMMISSIONER OF SOCIAL SECURITY,

                       **Defendant.**

-----------------------------------------------------------------X

**15-CV-07602 (SN)**

**OPINION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___ 2/8/2017

**SARAH NETBURN, United States Magistrate Judge:**

      Plaintiff Fortunado Ortiz, appearing pro se, brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g). He seeks judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI") benefits. The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Ortiz did not oppose the motion.

      The Administrative Law Judge's ("ALJ") decision was based on substantial evidence and free of legal error. Accordingly, the Court GRANTS the Commissioner's motion for judgment on the pleadings, and the case is dismissed with prejudice.

## BACKGROUND

**I.     Evidence in the Administrative Record**

      On December 20, 2011, Ortiz filed for SSI, alleging disability beginning on March 22, 2011, as a result of high blood pressure, high cholesterol, hepatitis C, and depression. The Social

Security Administration denied his initial application, and Ortiz requested a hearing before an ALJ.

### A. Ortiz's Testimony at the ALJ Hearing

On September 23, 2013, Ortiz testified before ALJ Moises Penalver with his attorney present. Ortiz was 56 years old and lived with his sister and nephew. He completed ninth grade and obtained a GED. Ortiz testified at the hearing that he had not worked on or off the books for the past fifteen years, though his SSI application indicated he had not worked since December 20, 2010.

Ortiz was able to travel by himself to attend group therapy meetings and to visit his doctor. He could travel by public transportation, though he usually walked to his appointments and meetings. When he would go out for a walk, however, he would be forced to stop and rest every few blocks. Ortiz could not do household chores because he would be out of breath if he did them. Ortiz testified he was unable to stand for over an hour or to sweep a floor. He also noted that his shortness of breath was likely because of his high blood pressure, for which he took medication.

Ortiz underwent treatment for hepatitis C beginning in December 2011 for about six or seven months. As a result of taking the medication for treating hepatitis C, Ortiz lost weight and did not want to be around people. He never resumed treatment after stopping treatment in June 2012.

Ortiz additionally reported feeling depressed three to four days per week. He visited a psychiatrist once a month, attended group therapy for his depression about every two weeks for one hour, and took two kinds of antidepressants, noting that the medication kept him "a little relaxed." Administrative Record ("AR") 37 (ECF No. 19).

### B.  Medical History

#### 1.  Physician Assistant Samuel Shahidi

Ortiz visited Physician Assistant ("PA") Samuel Shahidi at Lincoln Medical Center from

April 2011 to August 2013, after receiving a referral from his primary care physician for

monitoring kidney stones. PA Shahidi's examination results were consistently normal. As of

February 21, 2012, Ortiz reported feeling well and had no complaints of pain in his flank or

abdomen.

#### 2.  Dr. Michael Skelley

Ortiz's first documented visit with Dr. Michael Skelley, a physician at Lincoln Medical

Center's parasitology clinic, was on May 23, 2011. Ortiz tested positive for chronic hepatitis C.

Dr. Skelley noted that Ortiz did not have any previous treatment for hepatitis C but his medical

history included hypertension and high cholesterol. An examination yielded unremarkable

results, with vital stable signs. Ortiz's follow-up appointments with Dr. Skelley in June 2011 and

August 2011 did not show any changes to the May 2011 examination results. In November 2011,

Ortiz presented with complaints of generalized pain. Dr. Skelley advised Ortiz that he would be

prescribed two medications for the treatment of hepatitis C (Pegasys and Ribavirin); if he was

able to tolerate those medications, he could begin Boceprevir[1] therapy in about a month. About a

month later, Dr. Skelley reported that Ortiz was tolerating the medications well. Blood tests

performed in January 2012 indicated that Ortiz's hepatitis C viral load (the amount of the

hepatitis C virus in the blood) had decreased significantly, and that his liver function tests

showed normal results.

---

[1] Boceprevir is part of a class of antiviral drugs used to treat hepatitis caused by the hepatitis C virus.

Test results from Ortiz's appointments with Dr. Skelley in February and March 2012 showed that the hepatitis C virus was "not detectable." AR 360, 396. During an April 26, 2012 appointment, Dr. Skelley reported that Ortiz's hepatitis C viral load was once again undetectable, but that he had developed severe anemia. Dr. Skelley proscribed Procrit to treat his anemia. Ortiz's May 2012 blood tests showed abnormal results, but he denied fever or any discomfort, and reported no symptoms.

Test results for a June 11, 2012 appointment showed that the hepatitis C virus was once again undetectable. By that date, Ortiz had completed Interferon[2] therapy and would complete Ribavirin and Boceprevir therapy by June 15, 2012. Ortiz was given a psychiatrist referral for his depression and advised to schedule a return appointment with Dr. Skelley in six months. Dr. Skelley's Treating Physician's Wellness Plan Report, also dated June 11, 2012, indicated that the hepatitis C virus was undetectable after starting treatment in December 2011, and, although Ortiz was "temporarily unemployable" because of severe fatigue due to anemia, he would be able to complete therapy by June 15, 2012. AR 318. Dr. Skelley later confirmed, via a handwritten note on this Report, that Ortiz was "ok" to return to work. Id.

The last documented visit with Dr. Skelley was in December 2012. Ortiz's examination results were normal. His hepatitis C, after completing a 6-month treatment, was undetectable. According to Dr. Skelley, Ortiz was "clinically cured," and [n]o further treatment or evaluation is needed." AR 382.

### 3. FEGS Evaluation

Ortiz underwent a physical and psychiatric evaluation by the Federation Employment and Guidance Service ("FEGS"), a nonprofit human service provider based in New York, on April

---

[2] Interferon is used in the treatment of certain types of hepatitis C.

20-24, 2012. Ortiz informed Karen Perez, the evaluating social worker, that he had a history of depression and anxiety, but was not in psychiatric treatment at that time. His PHQ-9 score[3] was a 14, indicating "Moderate" depression. AR 338. Ortiz had traveled independently to the appointment and reported no other travel limitations. He also reported being able to perform several household and personal activities, including washing dishes and clothes, sweeping the floor, vacuuming, shopping for groceries, cooking meals, socializing, getting dressed, and grooming himself. Ortiz, however, indicated that he actually did not do any chores "due to no stable home" and that he spent "his day in the streets." AR 339. Dr. Mohammad Shuja performed a physical examination as part of the evaluation. The examination results were mostly normal, except for hepatitis C that was under treatment, anemia, mild depression, and mild neutropenia (reduced white blood cell count). Blood testing showed abnormal results, and Ortiz was advised to visit his primary care physician. Dr. Shuja diagnosed anemia, hepatitis C, hypertension, and depressive disorder, but did not assess any work-related limitations.

### 4. Dr. Suzanne Hirsch

Ortiz first participated in group therapy for depression with Dr. Suzanne Hirsch, a Clinical Psychologist Specialist at Lincoln Medical Center, in September 2012. At his first session, Ortiz discussed his experiences with substance abuse group therapy, listened to other members, and was "able to disclose and relate appropriately." AR 417. From September 2012 to January 2013, Dr. Hirsch reported that Ortiz presented "a stable mood at baseline" and discussed his issues with substance abuse, pain management, social withdrawal, and the supportive relationship he had with his sister. AR 419–22. In January 2013, Ortiz shared with the group that

---

[3] The Patient Health Questionnaire ("PHQ-9") is the depression module of a diagnostic instrument, which scores each of the nine DSM-IV criteria as "0" (not at all) to "3" (nearly every day). It is not a screening tool for depression but is used to monitor the severity of depression and response to treatment.

he was "generally doing fine" and even provided feedback to other members on managing one's mood. AR 424. Dr. Hirsch's notes for the March 2013 session stated that Ortiz was responsive to the supportive group process. AR 425.

### 5. Dr. Saul Friedman

Ortiz visited Lincoln Medical Center on July 10, 2013 for evaluation of a hernia. Dr. Saul Friedman's notes for that appointment showed Ortiz had been clinically cured of hepatitis C. Ortiz was described as "generally healthy," and his examination results were normal. AR 377.

### C. Treating Physician's Disability Opinion

Dr. Michael Adams, a psychiatrist at Lincoln Medical Center, performed a Psychiatric Assessment of Ortiz's mental state in March 2013. Ortiz presented with intermittent feelings of sadness, decreased energy, and passive suicidal thoughts but no suicidal intent or plan. In a Medical Assessment of Ability to Do Work-Related Activities form, Dr. Adams noted that Ortiz rated "Poor/None" in the following areas: (1) following work rules; (2) relating to co-workers; (3) dealing with the public; (4) interacting with supervisors; (5) dealing with work stresses; (6) understanding, remembering and carrying out complex job instructions, as well as detailed (but not complex) job instructions. AR 306–07. Dr. Adams further opined that Ortiz's poor attention and concentration skills would make it difficult for him to perform complex tasks. But Ortiz was rated as "Fair" in using judgment, maintaining attention and concentration, and carrying out simple job instructions, as well as "Good" in functioning independently. Id.

In an undated Treating Physician's Wellness Plan Report, Dr. Adams opined that Ortiz would not be able to work for at least 12 months because of intermittent depressive symptoms, passive suicidal ideation, and difficulty focusing and concentrating. His symptoms improved, however, while taking Paxil and attending group therapy.

Examination notes from Dr. Adams in May 2013 indicated that Ortiz denied feelings of hopelessness or suicide, but reported intermittent feelings of depression "typically in the context of family conflict." AR 321. According to Dr. Adams, Ortiz's depression was in partial remission and he was at his psychiatric baseline. Ortiz did not want to change medications at that time. Dr. Adams did not assess any "gross deficits" in Ortiz's attention and calculation, recall, language, insight and judgment. AR 320–21. Dr. Adam's May 2013 Treating Physician's Wellness Plan Report stated that Ortiz's depressive symptoms began on March 16, 2012. Those symptoms included feelings of depression, insomnia, decreased interest, and decreased energy. Dr. Adams concluded that Ortiz was temporarily unemployable as a result of depression in partial remission.

### D.  Consultative Examinations

#### 1.  Dr. Herb Meadow

On January 25, 2012, Dr. Herb Meadow[4] conducted a psychiatric evaluation of Ortiz at the request of the Social Security Administration. Ortiz came to the psychiatric evaluation on his own by public transportation. Ortiz denied feeling depressed at the time, suicidal intent, panic attacks or having any cognitive deficits. Dr. Meadow diagnosed Ortiz with a history of depressive disorder in remission, substance abuse in remission, and opiate dependence. Ortiz's thought processes were described as "[c]oherent and goal directed," intact memory skills, and fair insight and judgment. AR 282. Ortiz reported to Dr. Meadow that he looked after his personal hygiene, socialized with friends and family, and spent his time watching television and reading. Dr. Meadow concluded that Ortiz would be "able to perform complex tasks independently, learn new tasks, maintain a regular schedule, maintain attention and

---

[4] Dr. Meadow was indicted on charges relating to health care fraud. On November 5, 2015, he pled guilty to two charges, Attempted Enterprise Corruption and Health Care Fraud in the third degree.

concentration, make appropriate decisions, relate adequately with others, and deal with stress," as well as manage his own money. AR 283. He also opined that Ortiz's psychiatric problems did not appear to be significant enough to interfere with his ability to function on a daily basis.

### 2. Dr. Marilee Mescon

On the same day as Dr. Meadow's psychiatric evaluation, Dr. Marilee Mescon performed an internal medical examination. Ortiz reported that he often felt tired and experienced issues with his memory and concentration, but no pain. Dr. Mescon diagnosed Ortiz with hepatitis C, under treatment at the time, and high blood pressure. Dr. Mescon's examination results were normal. She opined that there were "no limitations in the claimant's ability to sit, stand, climb, push, pull, or carry heavy objects at this time, as long as the claimant does not develop adverse reactions to the medication he is taking for the hepatitis C." AR 288. Because of Ortiz's history of asthma, Dr. Mescon recommended avoiding any working environment that contained toxic dust, chemicals, or fumes.

### 3. Dr. L. Meade

Dr. L. Meade, a State agency psychological consultant, performed a mental examination of Ortiz on February 10, 2012. She concluded that Ortiz's mental impairments were not severe. A review of Dr. Meade's Psychiatric Review Technique form (which is mostly empty) suggests that Dr. Meade performed only an examination and not a review of the records.

### 4. Dr. Niyati Bhagwati

On April 17, 2012, Ortiz was referred to Dr. Niyati Bhagwati at Lincoln Medical Center for a consultation for pancytopenia (a reduction in red and white blood cells, and platelets). Ortiz complained of dizziness and fatigue. Except for conjunctival pallor (paleness of skin), all other examination results were normal. Dr. Bhagwati diagnosed Ortiz with pancytopenia from

treatment of hepatitis C. Ortiz declined Dr. Bhagwati's recommendation to undergo a blood transfusion for anemia.

### E.  Vocational Expert

At the September 23, 2013 administrative hearing, the ALJ presented vocational expert Melissa Fass Karlin with a hypothetical claimant with the following characteristics: an individual of Ortiz's age, education, and work experience who had to avoid exposure to noxious fumes and dust; who was limited to simple, routine tasks; who was limited to working in a low-stress job defined as requiring only occasional decision making and limited exercise of judgment; and who could tolerate only occasional, brief, and superficial contact with the public, and occasional interaction with coworkers. Ms. Karlin responded that, at the medium skill level, the claimant could work as a hand packager, and, at the light skill level, as a routing clerk, a marker or as a mail clerk.

The ALJ then presented another hypothetical to Ms. Karlin, in which the claimant possessed the same characteristics as in the situation above, except that he could tolerate no interaction with the public and only occasional supervision. Ms. Karlin presented the same jobs as above, and stated that, regarding unskilled work, an employee would be allowed a maximum of one day off per month.

Ms. Karlin clarified, upon inquiry from Ortiz's attorney, that an inability to deal with supervisors would affect a claimant's employability.

## II.    Procedural History

### A.  The Commissioner's Decision

The ALJ found that Ortiz suffered from medical impairments including major depressive disorder, antisocial personality disorder, opiate dependence on agonist therapy, a history of

substance abuse, and a history of asthma, but not hepatitis C and the resulting anemia. Based on

his review of the record, the ALJ determined that Ortiz had the residual functional capacity

("RFC") to perform medium exertional work, as defined in 20 C.F.R. 416.967(c), subject to the

following limitations: (1) avoiding noxious fumes and dust, and (2) performing "simple, routine

tasks, in a low stress job" with "only occasional, brief and superficial contact with the public"

and "only occasional interaction with co-workers." AR 19. The ALJ concluded that Ortiz was

"not disabled" within the meaning of the Social Security Act, based on his residual functional

capacity, age, education, and work experience. AR 22. Accordingly, he denied Ortiz's

application for SSI, finding him not disabled from December 20, 2011 (the date the application

was filed) through the date of the decision. The Appeals Council denied his request for a review,

and the ALJ's decision became the final decision of the Commissioner.

### B.  These Proceedings

Ortiz sought review of the Commissioner's decision under 42 U.S.C. § 405(g). The

Commissioner moved for judgment on the pleadings under Federal Rule of Civil Procedure

12(c), arguing that the Commissioner's decision must be upheld because it was supported by

substantial evidence and free from legal error. The parties consented to the Court's jurisdiction

for all purposes on August 16, 2016. Ortiz has not submitted an opposition to the

Commissioner's motion for judgment on the pleadings. The Court therefore considers the motion

to be fully briefed.

### DISCUSSION

### I.   Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings

that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v.

Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Pursuant to 42 U.S.C. § 405(g), however, the factual findings of the Commissioner are conclusive when they are supported by substantial evidence. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). "[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and emphasis omitted).

Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without first reviewing the record and determining whether there is a sufficient basis for granting the motion. See Wellington v. Astrue, 12 Civ. 03523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09 Civ. 01701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits).

## II.     Definition of Disability

The Social Security Act defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 416.920(a)(4). The steps are followed in sequential order. If it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 [(the "Listings")] . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform his past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

**III.    Analysis of the ALJ's Determination**

   **A.  Step 2: Severe Impairments**

Under the applicable regulations, an "impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). Additionally, to qualify as an impairment, the plaintiff's symptoms must have lasted or be expected to last for a period of at least 12 months. <u>See</u> 20 C.F.R. § 416.909. The ALJ limited Ortiz's severe impairments to include major depressive disorder, a history of substance abuse, and a history of asthma. Excluded from this list were hepatitis C, anemia, and high blood pressure because these impairments did not last for 12 months. Regarding his alleged psychological conditions, the ALJ determined that Ortiz faced only "mild restrictions" in activities of daily living, "moderate difficulties" in social functioning, and "mild difficulties" in concentration, persistence or pace. AR 18. Based on those findings and the fact that Ortiz had no documented history of decompensation, the ALJ found that any mental impairment was not "severe" within the meaning of the Social Security regulations.

There is substantial evidence to support the ALJ's finding that Ortiz's severe impairments are limited to major depressive disorder, a history of substance abuse, and a history of asthma. The record, including his testimony at the ALJ hearing, indicates that treatment for his hepatitis C spanned six to seven months at the most (from December 2011 to June 2012), and did not cause severe limitations for the requisite 12 months. Dr. Skelley's treatment notes during that time period reflected consistent decreases in the hepatitis C virus in Ortiz's blood test results. By December 2012, Dr. Skelley noted that the hepatitis C virus was undetectable, that he was "clinically cured," and that no further treatment was required. AR 382. Dr. Friedman also declared Ortiz to be cured of hepatitis C as of July 2013. In addition, any complaints relating to

anemia appear only sporadically throughout his medical records. Ortiz was diagnosed with pancytopenia as a result of hepatitis C therapy on April 17, 2012. He denied a blood transfusion to help with anemia, but expressed a willingness to try Procrit. Although Ortiz was determined to be "temporarily unemployable" as a result of severe anemia in June 2012, Dr. Skelley subsequently considered him to be "ok" to return back to work. AR 318. Finally, Ortiz reported having high blood pressure during the January 25, 2012 consultative examination with Dr. Mescon. His blood pressure that day, however, was within the normal range. He denied ever being hospitalized for hypertension. Dr. Mescon opined that there were no limitations in his ability to sit, stand, climb, push, pull, or carry heavy objects. At his hearing, Ortiz stated that he was taking medication for his high blood pressure.

Because there is no evidence that Ortiz's hepatitis C, anemia, and high blood pressure interfere with his ability to do basic work activities, there is substantial evidence to support the ALJ's finding that his severe impairments are limited to depression, a history of substance abuse, and a history of asthma.

### B.  Step 3: Impairment Listings

At step three, the ALJ determined that none of Ortiz's severe impairments, taken individually or in combination with each other, meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. To satisfy the requirements for the listed impairment of asthma, a plaintiff must show he suffers from chronic asthmatic bronchitis or attacks occurring at least once every two months or six times a year. Ortiz has denied any visits or hospitalizations due to symptoms of asthma. In addition, there is no evidence in the record indicating that Ortiz's mental impairments fulfill any of the listed criteria for a finding of per se disability. Ortiz reported being able to take care of his personal hygiene, go

outside six days a week, shop in stores, and manage money. He consistently used public transportation on his own to go to examinations, appointments, and meetings. In terms of social functioning, he reported not having any problems getting along with family or friends. Ortiz, moreover, participated in biweekly group therapy sessions where he was able to relate appropriately to other members and even shared his own advice with the rest of the group on how to manage one's moods. Dr. Hirsch, who presided over the therapy sessions, indicated that Ortiz was responding to the group therapy process and a "stable mood at baseline." AR 419. Ortiz also displayed intact attention, concentration, and memory skills during his mental status examinations.

Accordingly, there is substantial evidence to support the ALJ's finding that Ortiz does not have an impairment or combination of impairments that meets or medically equals any Listing disability.

### C.  Residual Functional Capacity

Before proceeding to step four, the ALJ determined that Ortiz had the RFC to perform simple routine tasks in a low stress job, with occasional interaction with coworkers, brief and superficial contact with the public, and limited exposure to noxious fumes and dust to prevent aggravating his asthma. The ALJ noted that, aside from a history of asthma, Ortiz did not have any ongoing severe physical conditions. The ALJ also incorporated nonexertional mental limitations, accounting for Ortiz's depression and antisocial personality traits, into the RFC.

In determining the weight to be given medical source opinions, including treating source opinions that are not afforded controlling weight, the ALJ should consider the length and nature of the treatment relationship, clinical and laboratory findings, the opinion's consistency with the record as a whole, the source's specialization, and any other relevant factors. 20 C.F.R.

§ 404.1527(d). The ALJ, however, "does not have to explicitly walk through these factors," as long as the court can conclude that the ALJ applied the substance of the treating physician rule and provided "good reasons" for the weight given to the treating source's opinion. Camille v. Colvin, 104 F. Supp. 3d 329, 341 (W.D.N.Y. 2015).

The ALJ gave "little weight" to Dr. Adam's conclusion that Ortiz was "temporarily unemployable" and would not be able to work for at least 12 months. AR 21, 311, 316. The ALJ also gave "some weight" to Dr. Adam's March 1, 2013 assessment that Ortiz had severe limitations in, among other areas, following work rules, relating to coworkers, behaving in an emotionally stable manner, and dealing with the public. The ALJ did not assign controlling weight despite the fact that Dr. Adams was a treating source because the contemporaneous treatment records, including Ortiz's "largely normal mental status examinations on both treating and consultative evaluations," did not support such severe limitations. Id.

Substantial evidence supports the ALJ's conclusion that Dr. Adams's opinion of disability and of severe limitations was not controlling. The opinions of treating sources are entitled to controlling weight if they are well supported and not contradicted. 20 C.F.R. §§ 404.1527, 416.927. But the ALJ is not required to give controlling weight to treating physicians' opinions as to whether the claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he ultimate finding of whether a claimant is disabled and cannot work—[is] reserved to the Commissioner.") (internal citation and quotation marks omitted); Francois v. Astrue, No. 09 Civ. 6625 (HB), 2010 WL 2506720, at *5 (S.D.N.Y. June 21, 2010).

The results of Ortiz's examinations, including ones conducted by Dr. Adams, indicate that he retained the capacity to perform simple, routine tasks in a low stress job, with occasional interaction with his coworkers and brief interaction with the public. As of May 1, 2013, Dr. Adams opined that Ortiz's depression was in partial remission, with intermittent feelings of depression and denial of feelings of hopelessness or suicidal ideation. Dr. Adams found Ortiz's thought processes to be coherent, goal directed and logical. He reported "no gross deficits" in Ortiz's attention and calculation, recall, language, insight, and judgment. AR 320–21. Dr. Adams assessed Ortiz to be "fair" in carrying out simple job instructions and maintaining concentration, and "good" at functioning independently. AR 306–07. Although Ortiz's mood was sometimes noted as depressed, he denied active suicidal ideation or feelings of hopelessness. Dr. Adams also noted that Ortiz's symptoms of depressed mood and decreased energy appeared to improve while taking medication. Ortiz was able to attend biweekly, hour-long group therapy sessions, in which he reported he was doing well and even shared advice with the other members of the group. Moreover, the ALJ adequately explained the reasoning behind his decision to assign some but not controlling weight to Dr. Adams's opinion. Although the ALJ did not refer explicitly to the factors in 20 C.F.R. § 404.1527(c)(2), this omission does not require remand because the ALJ "applied the substance of the treating physician rule." Halloran, 362 F.3d at 31–32 (affirming the ALJ's opinion that did "not expressly acknowledge the treating physician rule").

In addition, the ALJ gave "great weight" to Dr. Mescon's opinion, which indicated that Ortiz had "no limitations in his ability to sit, stand, climb, push, pull, or carry heavy objects as long as he did not develop adverse reactions to the medication he was taking for hepatitis C," because it was consistent with the medical evidence. AR 20. See Netter v. Astrue, 272 F. App'x 54, 55–56 (2d Cir. 2008) (reports of consultative physicians may override those of treating

physicians, so long as they are supported by substantial evidence in the record); Smith v. Colvin, 17 F. Supp. 3d 260, 268 (W.D.N.Y. 2014) (the opinions of consulting sources "may constitute substantial evidence if they are consistent with the record as a whole") (internal citation and quotation marks omitted); Vanterpool v. Colvin, No. 12 Civ. 8789 (VEC)(SN), 2014 WL 1979925, at *16 (S.D.N.Y. May 15, 2014) (the ALJ did not err in affording greater weight to the opinion of the consultative physician where the opinion was more consistent with the treating physician's medical records). The ALJ incorporated into his RFC the assessment by Dr. Mescon that Ortiz's history of asthma and repeated complaints of shortness of breath may require "environmental limitations" but did not pose marked restrictions. Dr. Mescon's opinion is supported by the record, which reflects consistently normal physical examination results.

Furthermore, the ALJ properly assigned "little weight" to Dr. Meade's summary opinion that Ortiz's mental impairments were not severe, because "the record does indicate that the claimant has some mental limitations due to his impairments." AR 22. The basis of Dr. Meade's opinion is simply a checked box that Ortiz's mental impairments were not severe. No analysis or explanation was provided.

The ALJ cited Dr. Meadow's consultative opinion that Ortiz would be able to "perform complex tasks independently, learn new tasks, maintain a regular schedule, maintain attention and concentration, make appropriate decisions, relate adequately with others, and deal with stress" in his decision, but did not indicate expressly what weight he would give to the opinion. AR 20–21. The Court reads the ALJ decision to give less than controlling, if any, weight to Dr. Meadow's finding of almost no limitations, given that the ALJ gave "some" weight to Dr. Adam's finding of some mental limitations and that the RFC conclusion incorporated those limitations. Under the Social Security Act's regulations, an ALJ may (but is not required to) rely

on preexisting medical evidence from a consultative source, even when the consultants have subsequently had their licenses suspended or revoked, or had been barred from federal programs. See 20 C.F.R. § 416.903(a). The ALJ committed no error in assigning Dr. Meadow's opinion less than controlling, if any, weight, given that Dr. Meadow was not a treating physician and his assessment of almost no limitations was not corroborated by the record. See 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ additionally found Ortiz's subjective allegations to be not fully credible, because (1) his treatment records indicated that his hepatitis C had not been an issue since he finished treatment in June 2012; (2) Ortiz's psychiatric records showed consistently normal mental status examinations; and (3) Ortiz could perform many activities of daily living and social functioning without issues. At the hearing, Ortiz testified that after finishing treatment in 2012, he was able to gain back some of the weight and energy he had lost as a result of his hepatitis C virus. In addition, although Ortiz asserted he did not like being around people, he was able to attend a methadone program five days a week, attend group therapy every two weeks, use public transportation, go out by himself without any problem, and did not have any problems getting along with his family or friends. Ortiz's treating doctor found that he had no problems paying attention, and was able to follow simple instructions. Furthermore, at his hearing, Ortiz mentioned feeling anxious, to the point of becoming physically ill, and shortness of breath, which forced him to slow down and stop every two to three blocks when he was walking. He testified, however, that his current medication allowed him to feel relaxed. Accordingly, the ALJ's findings rest on substantial evidence and are affirmed.

D.      **Step 5: Disability Determination**

At step five, the ALJ determined that based on Ortiz's age, education, previous work, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." AR 22. "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2." Rosa, 168 F.3d at 78 (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986) (internal quotation marks omitted). The Grid takes into account the claimant's residual functional capacity, age, education and prior work experience, and yields a decision of "disabled" or "not disabled." See Mezzacappa v. Astrue, 749 F. Supp. 2d 192, 206 (S.D.N.Y. 2010) (citing 20 CFR § 404.1569 & Subpt. P, App. 2, 200.00(a)). "Generally the result listed in the Grid is dispositive on the issue of disability," except in instances where "the medical-vocational guidelines fail to accurately describe a claimant's particular limitations." Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). Accordingly, the ALJ correctly concluded that Ortiz is not disabled.

## CONCLUSION

The ALJ's finding that Ortiz is not disabled was based on substantial evidence and free of legal error. Accordingly, the Commissioner's motion for judgment on the pleadings is GRANTED and the case is dismissed with prejudice. The Court requests that the Clerk of Court terminate the motion at ECF No. 15 and close this case.

**SO ORDERED.**

DATED:      New York, New York                    _____
            February 8, 2017                      SARAH NETBURN
                                                  United States Magistrate Judge

cc:         Fortunado Ortiz (*by Chambers*)
            1156 College Ave., Apt. 5A
            Bronx, NY 10456-5141